Filed 1/4/23  P. v. Conrady CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B322516 |
| Plaintiff and Respondent, | |
| v. | (Merced County Super. Ct. No. 18CR-06159) |
| CHANISH CONRADY, | |
| Defendant and Appellant. | |
| —————————————— | |
| THE PEOPLE, | |
| Plaintiff and Respondent, | B322531 |
| v. | |
| STEVE REA PEREZ, JR., | |
| Defendant and Appellant. | |

APPEALS from judgments of the Superior Court of Merced County, Carol K. Ash, Judge.  Convictions affirmed, sentence vacated, and remanded with directions as to Steve Rea Perez, Jr.  Affirmed in part and reversed in part; remanded with directions as to Chanish Conrady.

Matthew J. Watts, under appointment by the Court of Appeal, for Defendant and Appellant Chanish Conrady.

Valerie G. Wass, under appointment by the Court of Appeal, for Defendant and Appellant Steve Rea Perez, Jr.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

———————————

Four-year-old Kyis Conrady (Kyis) died while in the care of his mother, Chanish Conrady (Chanish), and Chanish's boyfriend, Steve Rea Perez, Jr.  The jury found Perez guilty of assault on a child causing death (Pen. Code, § 273ab, subd. (a);[1] count 1) and felony child abuse (§ 273a, subd. (a); count 4).  The same jury found Chanish guilty of three counts of felony child abuse for having care or custody of Kyis and willfully permitting Kyis to be injured (§ 273a, subd. (a); counts 2-4).

On appeal, Perez contends the trial court abused its discretion in admitting Kyis's statement that Perez had hit him and an autopsy photograph of Kyis.  Perez also argues the trial court erred in providing erroneous and incomplete jury

_____

[1]      Further undesignated statutory references are to the Penal Code.

2

instructions for felony child abuse and improperly instructing on the lesser included offense of assault on a child causing death. In addition, Perez asserts the trial court abused its discretion by failing to declare a mistrial after the jury deadlocked and by subsequently discharging a juror without determining whether there was good cause to dismiss the juror. Further, both Perez and Chanish contend there was not substantial evidence to support their convictions. Chanish also challenges her sentence, arguing the trial court violated section 654 by failing to stay two of her three felony child abuse convictions because they arose from a single course of conduct.

In addition, in his supplemental brief Perez contends, the People concede, and we agree, that because the trial court selected the upper term on count 4, he is entitled to resentencing pursuant to the amendments to section 1170, subdivision (b), made by Senate Bill No. 567 (Stats. 2021, ch. 731, § 1.3) (Senate Bill 567), which apply to all cases not yet final as of the legislation's January 1, 2022 effective date.

We affirm Perez's convictions. We reverse Chanish's felony child abuse conviction on count 4 and otherwise affirm. We remand for resentencing as to Perez and Chanish consistent with the amendments to section 1170, subdivision (b).

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Prosecution Case*

In 2013 17-year-old Chanish became pregnant after dating 19-year-old Kyle Conrady (Kyle). The couple moved in together, and Chanish gave birth to Kyis in May 2014. Chanish and Kyle married in 2016 but separated a year later.

3

After the separation, Kyle dated Naomi Lartigue and moved to Sacramento with Lartigue and her daughter Lydia in early 2018. Chanish dated Perez and moved with him to the city of Dos Palos in mid-2018. Chanish and Kyle had an informal custody agreement under which Chanish had custody of Kyis on weekdays and Kyle had custody on weekends.

### 1. *The September 2018 events (count 4)*

On Saturday, September 8, 2018, Kyle and four-year-old Kyis attended Lydia's birthday party, which was held by a river. Kyle watched over Kyis during the entire time they were at the party. After they came home, Kyle helped Kyis undress for a bath because Kyis's clothes were wet. When Kyle started pulling down Kyis's pants, Kyis said "'[o]w.'" Kyle noticed "a large bruise on [Kyis's] groin area." Kyle testified he asked Kyis "what had happened," and Kyis replied, "'Steve had punched me in the night.'" Kyle observed Kyis became nervous and did not want Kyle to leave his side. Kyle went to the kitchen and told Lartigue to take a look at Kyis. Lartigue heard Kyis crying and went into the bathroom. She saw a "blue and kind of purple-ish" bruise on Kyis's groin area.[2] Lartigue testified Kyis "was actually kind of scared and nervous to tell" Kyle and her that Perez "had went in his room at night and had punched him in his groin."

Kyle called Chanish and asked why Kyis had a bruise on his groin area. Chanish became upset and responded she did not know what Kyle was talking about. She asked Kyle to bring Kyis

---

[2] The prosecutor displayed to the jury a photograph of Kyis's groin injury (exhibit 101). The photograph shows a large blue and purple bruise to the groin area.

back to her home.[3]  Kyle refused, and Chanish threatened to call the police if Kyle did not bring Kyis back.  Kyle told Chanish "to go ahead and call the police, but [he] wasn't going to bring [Kyis] back."  The next day officers from the Sacramento Police Department came to Kyle's home to perform a welfare check of Kyis.  They instructed Kyle to bring Kyis to the Dos Palos Police Department on Monday, September 10.

At the Dos Palos police station, Dos Palos Police Officers Emeterio Cuevas and Battles and child protective services (CPS) social worker Antonio Ruezga interviewed Kyle and Kyis.  Kyle said Kyis had an injury to his groin area, and he showed a photograph of the injury to the officers and Ruezga.  Officer Battles then asked Kyis what had happened.  Kyle testified he was present for Kyis's interview because Kyis "wasn't comfortable doing the interview by himself."  Kyle told Kyis to tell Officer Battles what Kyis had told Kyle two days earlier.  Kyis responded that "'Steve hit me.'"  However, Kyis did not give any details or answer Officer Battles's follow-up questions about where, when, and how it happened.  Officer Battles asked Kyle whether Perez had hit him in the past, and Kyle responded no.  When asked whether he was afraid of Perez, Kyle said he was not.  During the interview, Ruezga asked Kyis about school, and Kyis responded that Perez had hit him.  Ruezga testified he found it odd because he did not ask Kyis if he got hurt.  After the interview, a five-day emergency protective order was issued

---

[3]  During custody exchanges, Kyle and Chanish would typically discuss any injuries Kyle had from riding his scooter or bike or playing on the playground.  During the custody exchange on Friday, September 7, 2018, Chanish did not inform Kyle about any injury to Kyis.

5

against Chanish and Perez, and Kyis returned with Kyle to Sacramento.

Ruezga and the officers interviewed Chanish, Perez, Perez's son and daughter, and Perez's ex-girlfriend, Christian Quiroz. At the conclusion of the investigation, Ruezga and the officers found the abuse allegation was inconclusive, and they decided not to detain Kyis.

After the emergency protective order expired, Kyle and Chanish formalized their custody arrangement. They agreed Kyis would reside with Chanish on weekdays to attend preschool and with Kyle on weekends. The parents further agreed Kyis would not be alone with either Lartigue or Perez.

2. *The October 2018 events (count 3)*

On Friday, October 12, 2018 Perez dropped off Kyis at his preschool. Perez informed Kyis's teacher, Melissa Harrelson, that a bug had bitten Kyis, causing a bump on the left side of Kyis's face. Harrelson did not see a bump on Kyis's face, but she told Perez she would "keep an eye on it."

Later that evening Kyle picked up Kyis from Chanish for the weekend and noticed a minor scratch and swelling near Kyis's left eye. Lartigue, who went with Kyle to pick up Kyis, testified she noticed a bump close to one of Kyis's eyes. Chanish told Kyle during the pickup that Kyis had been hit with a toy fire truck at school.[4] Kyis similarly told Kyle later that a child at his school had thrown a truck at him. That weekend, Kyle took Kyis to San Jose to visit his parents. Lartigue testified that during the weekend the bump near Kyis's eye started to swell. However,

---

[4] Harrelson testified the preschool had toy trucks but nothing of the size that could cause an injury.

6

Kyle put ice on the injury, and the swelling went down by the time he returned Kyis to Chanish at the end of the weekend.

Kyle testified that on Sunday, October 14, on the drive back to Chanish's home in Dos Palos, Kyis threw a tantrum in his booster seat and "just refused to go back to his mom." Kyis banged his head and tried to get out of his seat. According to Kyle, Kyis had been having tantrums throughout October, and this incident "was a little bit greater than the ones prior."[5] Kyle believed Kyis had tantrums because of the constant changes in Kyis's life, including multiple moves and changes in the people in his life, including Perez and Lartigue. Chanish told Kyle she believed Kyis might have autism or Asperger's syndrome.[6]

Harrelson testified that when Kyis returned to preschool on Monday, October 15, Kyis "might have [had] a little bit of bruising" and discoloration on the left side of his face, but otherwise he "looked normal." Chanish told Harrelson that Kyis said a student had thrown a toy at him. Kyis similarly told Harrelson a child had thrown a truck at him inside the classroom. But about an hour later Kyis told Harrelson a

---

[5] Harrelson testified that when Kyis started preschool in August 2018, he was "excited but nervous" and "happy to come to school." By October 2018, however, Kyis became "more nervous" and had "anxiety attacks" that involved uncontrollable crying "to the point where he would almost vomit." In addition, "[i]f a child got too close to him he would say that they touched him in some way [even though] . . . no other children would touch him."

[6] Chanish told Harrelson a therapist had evaluated Kyis for autism or Asperger's syndrome, but a documented diagnosis was never provided to Harrelson. Harrelson did not see any signs indicating Kyis had autism.

7

different story—that a child of the opposite gender had hit him with a toy outside the classroom.

Kyis did not attend school on October 16 and 17. Chanish told Harrelson she had taken Kyis to the hospital because Kyis's "eye had swelled up to the point where he was having trouble with his vision." On October 17 Officer Cuevas and Ruezga went to the hospital to investigate abuse allegations. Officer Cuevas observed the left side of Kyis's face was swollen and "smooshy," and "one of his eyes was swollen."[7] Chanish stated in Kyis's presence that a student had thrown a toy truck at Kyis's head and caused his injuries. Officer Cuevas asked Kyis what had happened to his face, and Kyis similarly answered that he was playing at school and a "'kid had a [plastic] truck'" and "'he throwed it at me.'" Chanish also reported the bruises on Kyis's shins were caused by Kyis falling off his bike. Ruezga observed Kyis appeared comfortable with Chanish and did not want to leave her side. When asked, Kyis stated he felt safe at home. Ruezga found the abuse allegation inconclusive and did not detain Kyis.

On October 18 Chanish brought Kyis back to school, and Harrelson observed Kyis had a swollen eye and some bruising on the left side of his face. Harrelson testified Kyle "was very timid, very shy," and "very attached" to her. That day Chanish and Perez met with the school program director, Joanne Birdsall. Chanish said a child had thrown a toy at Kyis in the classroom,

---

[7]     The prosecutor showed the jury photographs of Kyis's facial injuries (exhibit 106) and leg bruises taken at the hospital on October 17, 2018. The prosecutor also displayed two photographs of Kyis with facial injuries taken by Officer Cuevas at Chanish and Perez's home sometime between October 18 and 22.

but according to Birdsall, Chanish's explanation then "changed to a child out on the playground." Birdsall testified Chanish and Perez told her Kyle had been "hit pretty hard" by another student. Birdsall commented that if the injury was as bad as they were describing, Kyis would have cried or told a staff member. Perez responded that Kyis had a high threshold for pain.

On the afternoon of October 18, Harrelson overheard Kyis tell a teacher's aide, Alejandra Perez (Alejandra), "that he was at his dad's house, he was riding his bike, he broke his bike, and because of his broken bike, his dad had hit him." Kyis added that his dad told him to say one of his friends caused his injury, and not his dad. About 30 minutes later, Kyis told Harrelson one of his friends had hit him. When Harrelson or Alejandra asked Kyis to get the toy that had injured him, Kyis went to the classroom science area, looked around, and brought back a lightweight, plastic cylinder disk that was two-to-three inches in diameter (exhibit 103).[8] As a mandated reporter, Harrelson reported Kyis's allegation of Kyle's abuse to a CPS social worker. As a result, Officer Cuevas issued a five-day emergency protective order prohibiting Kyle from contact with Kyis. Kyle denied he ever hit Kyis or told Kyis to blame a friend for an injury to Kyis.

On October 22 Kyis was again admitted to the hospital for injuries. Officer Cuevas went to the hospital the next day to investigate suspected child abuse. Officer Cuevas took photographs of Kyis's facial injuries and noted the swelling on the left side of Kyis's face "didn't go down." The photographs

---

[8] The prosecutor showed the jury a photograph of the toy.

9

show significant swelling on both eyes.[9]  Officer Cuevas testified Kyis's injuries had gotten worse since he last saw Kyis on October 17.  Chanish reported Kyis "woke up with two bruised eyes" and complained of a headache; she gave him Benadryl and brought him to the hospital.  Officer Cuevas responded that the stories weren't "adding up" and he believed "there was more than that to it."  Chanish then said Kyis "did go to his father's house over the weekend, that he was riding his bike, and because he fell to the ground, the dad got upset, and he hit him, [and] that she didn't really know how or with what."  Officer Cuevas and Ruezga arranged for a multi-disciplinary interview center (MDIC) interview of Kyis.[10]

At 1:06 in the afternoon of October 24 Saul Rodriguez, a CPS support staff member, arrived at the hospital to transport Kyis and Chanish to Merced for a 2:30 p.m. MDIC interview. When Kyis learned he was leaving the hospital, he cried and refused to leave his hospital bed.  Rodriguez calmed Kyis down, and Kyis agreed to the car ride.  According to Rodriguez, "Chanish didn't provide any comfort to Kyis or talk to him or try to help him out."

They went to Rodriguez's car, and Chanish attempted to buckle Kyis's seatbelt as Rodriguez continued to talk to him. Kyis started "screaming and crying that he didn't want to go in the car."  When Rodriguez tried to help Chanish get Kyis in the

---

[9]     The prosecutor showed the jury the three photographs Officer Cuevas took at the hospital on October 23.

[10]     Officer Cuevas testified a MDIC interview of a child is performed by a social worker or professional in a neutral environment with two-way mirrors or video feeds where others can watch the interview.

car seat, he saw Chanish place part of her left hand into Kyis's mouth. Rodriguez asked her twice why she was doing that, but she did not respond. Rodriguez told her to stop. Kyis broke free; he ran out of the car crying, kicking, and screaming; and then he tripped on the curb and fell. Chanish told Rodriguez "she couldn't believe that it was okay for [Kyis] to bite her or hit her, but it wasn't okay for her to do the same to him." Chanish went to help Kyis, but he ran away from her. Chanish started screaming profanities and accused Kyis "of acting up so he could stay in the hospital and not go home." After five minutes, Chanish grabbed Kyis by his shirt collar and pulled him for a few minutes.

Chanish and Rodriguez tried to put Kyis in the car seat a second time, but they were not successful because Kyis was still "crying, screaming and refusing to go in the car." Chanish called a relative to bring her and Kyis home. After the call, Chanish threw her phone on the ground and screamed profanities. Kyis calmed down, but Chanish continued screaming and using profanities for 30 to 45 minutes. The MDIC interview was rescheduled for October 30, 2018.

On Saturday, October 27, after the emergency protective order expired, Kyle, Lartigue, and Lydia went to Dos Palos and took Kyis to the movies. According to Lartigue, Kyis looked worse than when they had last seen him two weeks earlier, with injuries to both eyes, which appeared sunken in, with discoloration to his jaw and shins. Chanish told Kyle that Kyis's injuries were caused by a student hitting Kyis with a fire truck and Kyis falling off a bike. Lartigue did not believe Chanish's explanations, noting Chanish did not look her in the eye as they talked. Chanish also failed to explain why Kyis's injuries were getting worse. Kyle drove Kyis back to Chanish's home after the

11

movies.  When Chanish greeted Kyis, Kyis "latched onto [Kyle] extremely tight and told [Kyle] that he didn't want to go with his mom."  Chanish's friend Dominique coaxed Kyis out of the car, and Kyis "eventually" went to Dominique.  At Chanish's request, Kyle, Lartigue, and Lydia went inside Chanish's home and stayed for about 20 minutes so Kyis would be comfortable with them leaving.

On Monday, October 29 Kyis had a panic attack at his preschool.  He started hyperventilating and cried for Chanish.  Harrelson saw a bruise on Kyis's face around his jaw and two bruises on his shins.  Harrelson brought Kyis to Birdsall's office because of the panic attack.  Kyis was crying and said his legs hurt.  At Birdsall's request, Kyis pulled up his pant legs, and Birdsall saw he had "some bruises on his legs."  Birdsall asked Kyis what had happened, and Kyis replied he fell off his bike.  Harrelson called Chanish to pick up Kyis.  Chanish confirmed Kyis got the injuries from falling off his bike.  She added that a hospital was running tests on Kyis to determine whether he might have a hereditary condition that caused his bruising.

On October 30 Ruezga drove Chanish and Kyis to the MDIC interview in Merced.  Officer Cuevas testified that "once the interview was about to take place, Kyis threw a big fit throwing chairs around, [and] kicking his mother."  The interview was cancelled because Kyis was not cooperative.  Officer Cuevas transported Chanish and Kyis back to Dos Palos.  During the 35-to-40-minute car ride back Kyis started kicking, tossing and turning, hitting his head on the booster seat, and cursing.  Chanish tried to calm Kyis down, but she was not successful.  According to Officer Cuevas, Chanish did not lose her temper, curse, or yell at Kyis.  When they arrived at Chanish and Perez's home, Kyis was still out of control, flailing his arms and shaking

12

his head.  However, Perez talked to Kyis and was able to calm him down.

3.	*Kyis's death in November 2018 (counts 1, 2)*

When Kyle picked up Kyis on Friday, November 2, 2018, Kyis complained his stomach hurt.  Kyis also had a "runny stool" that lasted until Saturday morning.  On Saturday, Kyle took Kyis to visit Kyle's parents in San Jose.  While there, Kyis soiled his pants and threw a tantrum, kicking, screaming, and trying to hit himself in the face.  Kyle brought Kyis back to Chanish's home on Monday evening.  On the drive back, Kyis threw another tantrum and said multiple times he "'hated his mom.'"[11]  When they arrived, Chanish stood outside the car, and Kyis said he did not want to go with her.

The following evening (November 6), Kyle talked to Kyis by telephone before Kyis's bedtime.  At 11:36 p.m. Perez called 911.  At the start of the call, Perez said, "Hey, get your ass up now. [unintelligible] what's going on buddy?"[12]  Perez told the operator that his stepson "just was walking to the bathroom and fell over right now."  Paramedic Brian Milbauer, his paramedic partner, and a paramedic intern responded to Chanish and Perez's home. Milbauer testified that when they arrived, they found Kyis lying

_____

[11]	Lartigue testified Kyis began saying he hated his mom after the September 2018 incident.  Kyis also told Lartigue that he did not like Perez, Perez yelled at him, and Perez threw hot sauce at him.  Kyle similarly testified that sometime after the September 2018 incident, Kyis told him that Perez put "hot Cheetos" in Kyis's eyes.

[12]	The prosecutor played a recording of Perez's 911 call for the jury.

13

on his back on the bed in a bedroom.  Chanish told the paramedics Kyis was returning from the bathroom when he collapsed and fell to the floor.  Chanish and Perez moved Kyis to the bed and poured cold water on him to wake him up, but he was unresponsive.  Milbauer described the situation when he arrived as there being an "off feeling in the house"; he found it "strange" that Chanish, as the mother, was "not as hysterical as you would expect one to be."

Milbauer determined Kyis had fluid build-up on the top of his head, which was "not normal at all for anybody."  Because Kyis had a "very weak pulse," the paramedics rushed him to the hospital.  But as Kyis was being carried to the ambulance, he lost his pulse.  Milbauer and the intern attempted to resuscitate Kyle during the ride to the hospital, but Kyis did not regain a pulse.

Around midnight Kyle received a call from Chanish, who said Kyis had a seizure and "passed out," and she and Kyis were going to the hospital.  Kyle and Lartigue immediately drove from Sacramento to the hospital.  About a half hour into their drive, Chanish called to report that Kyis had died.  When Kyle arrived at the hospital, Perez hugged Kyle and said, "'I tried.  I tried.  I'm sorry.'"  Kyle and Chanish also hugged, and Kyle told Chanish that she was a good mom.  Lartigue observed Chanish was crying "off and on" at the hospital.  Chanish told Lartigue, "'I'm sorry. I'm sorry for everything,'" and she thanked Lartigue for taking care of Kyis.  After Kyis's death, Chanish called Birdsall and said Kyis "had seizures, and that he had passed away."  Birdsall testified "[it] was just like we were having a regular conversation," and Chanish was not "emotional or anything."

14

4.    *The autopsy*

On November 8 Dr. Mark Super, a forensic pathologist, conducted an autopsy of Kyis.  At the time of death, four-year-old Kyis was 3 feet 5 inches tall and weighed 40 pounds.  Kyis had a tear in his mesentery,[13] a lacerated liver, bruises on his small bowel and both lungs, head injuries, two bruises on the back of his right hand, a bruise on the back of his left forearm, a healing bruise on his left elbow, bruises on both legs, and bruises on both sides of his abdomen and chest.  Most of the bruises were not likely to be caused by a child's "rough and tumble" play.  The court admitted a photograph of Kyis taken at the time of the autopsy (exhibit 102), on which Dr. Super pointed out the bruises on Kyis's abdomen and chest, a healing bruise on his scalp with a subscapular hematoma, and "two more recent bruises on the front of his scalp and then on the mid-back of his scalp."  Dr. Super testified "[t]he head injuries were severe," but "[i]t didn't appear to be serious enough to have caused his death."

Dr. Super opined Kyis died from "bleeding in the abdomen due to blunt impact abdominal injuries," likely caused by one or more punches or kicks.  Given the type of abdominal injury, the child "would cry bloody murder if somebody hit [him] that hard in the abdomen assuming that . . . he's alert and awake during this whole process."  It would "[a]bsolutely" be painful.  Because the injury was to his abdomen, the child would become nauseous and

---

[13]    The mesentery is a fold of membrane that attaches the intestine to the abdominal wall. (<https://www.mayoclinic.org/diseases-conditions/swollen-lymph-nodes/multimedia/mesentery/img-20007559#:~:text=The%20mesentery%20is%20a%20fold,lymph%20nodes%20in%20the%20mesentery> [as of January 4, 2023].)

weak, and "the longer he gets into shock, then he becomes disoriented." The punches or kicks would have caused him to become unconscious but "wouldn't kill him instantly." Dr. Super explained "it takes time for this injury to result in [] shock and death, so it takes probably several hours" to cause death. Dr. Super opined that because of the severity of the injury, "[e]ven three hours I think would be a lot for a little child like that." He added, "I'm taking three hours to be kind of where I would think this child could possibly survive this . . . if this thing wasn't bleeding profusely right off the bat."

On cross-examination, Dr. Super acknowledged Kyis's abdominal injury could have been caused by falling "from some good height onto something rounded" or "a really significant bicycle accident," but "[i]t's not going to cause all the rest of the bruises." Further, the bruise and hematoma were not likely to have been caused by another child with a toy truck because the injury to the top left side of Kyis's head was very large, and a toy would "cause a very small area of injury even if it caused an injury." Dr. Super acknowledged, however, that a minor head injury could be exacerbated by a child banging his head against a car window during a tantrum.

5.    *The police investigation*

On November 15, 2018 a police detective requested Lartigue to make a pretext call to Chanish "to ask her questions about the night of the incident." Lartigue made the call from a detective's office, and the call was recorded. Chanish told Lartigue she was in the bathroom when she saw Kyis "fall on the floor and ha[ve] a seizure." Chanish confirmed four times that she saw Kyis have a seizure and collapse.

16

On November 20 Merced County Sheriff's Detectives Jose Andrade and Ortiz interviewed Chanish at the Merced County Sheriff's Department office.[14]  Chanish stated she went to sleep at 9 p.m. on November 6 because she was tired from her pregnancy and had taken an anti-depressant medication.  She did not see Kyis fall.  Perez woke Chanish up and called the ambulance.  Perez told Chanish he woke up when Kyis threw up in the bathroom.  Perez gave Kyis some water and sent him back to bed.  Fifteen minutes later, Kyis came out of his bedroom and "'just dropped.'"  Chanish had experienced seizures and fainting spells, and she thought Kyis had a seizure, although he had never had one before.  When Chanish went into Kyis's bedroom, she saw he had urinated in his bed.  Chanish explained she told Lartigue that she saw Kyis fall because "'[it's] just Naomi, and I don't trust her.'"  Chanish lied to Lartigue "'[b]ecause she's not his mother'" and "I told her just whatever I told her to [get] her off the phone."

B.    *The Defense Case*

Perez testified on his own behalf.[15]  Perez was in a relationship with Quiroz before they broke up in December 2017.  Perez and Quiroz have a nine-year-old son and an eight-year-old daughter.  In March 2018 Perez started dating Chanish, and they immediately started living together.  Kyis lived with Perez and Chanish on the weekdays and Kyle on weekends, unless Kyle cancelled the visit.  Perez's children visited on the weekends and

---

[14]    Chanish spoke to the detectives after waiving her *Miranda* rights.  (*Miranda v. Arizona* (1966) 384 U.S. 436.)  The prosecutor played portions of the interview for the jury.

[15]    Chanish did not testify.

shared a room with Kyis. Perez had "a very good" relationship with Kyis. They watched television together, including football games, they played video games, and sometimes Kyis would join Perez when he exercised. Perez took Kyis to the park, to the river a couple of times, and to a high school football game. He also taught Kyis how to ride a bicycle. At school, Kyis made Perez "a bracelet with the Rams colors because [Perez was] a Rams fan." Kyis was "an active kid" who "liked to play a lot." Kyis "could get frustrated pretty quick," and if something did not go his way, he would throw a tantrum by screaming and "sometimes trying to scratch or kick." Chanish would get frustrated by Kyis's tantrums, and she would sometimes yell or curse.

Perez testified he did not discipline Kyis. However, on cross-examination he admitted he told detectives that he spanked his son. He stated it occurred only one time, during his relationship with Quiroz. Perez denied ever hitting Kyis, and he was shocked when he heard the allegation. Perez loved Kyis and would not do anything to hurt him.

In October 2018 Perez was out of town when Chanish informed him that Kyis had gotten hit in the head by a student from the preschool. When Perez came home, he saw Kyis had a bump on the left side of his head. The next week Perez's son woke up Perez and Chanish and said Kyis's eyes were shut. Perez went to the children's bedroom and saw Kyis's eyes were "really swollen." Chanish's grandmother took Chanish and Kyis to the hospital, and Kyis was hospitalized for two days.

Perez learned from Chanish there was an attempt to interview Kyis. When Officer Cuevas, Chanish, and Kyis returned from the scheduled interview, Chanish went inside the apartment and told Perez that Kyis "was throwing a fit and

18

didn't want to get out of the police car."  Perez went outside to calm Kyis down, and Kyis grabbed him and held him tight.  Kyis said, "'All I wanted was you.'"  Perez was able to get Kyis out of the car and into the apartment.

On Monday, November 5, 2018, Kyis "seemed a little irritated" when he returned from his stay with Kyle.  Perez believed Kyis wanted to stay longer with Kyle.  The next day when Kyis returned from school at around noon, he "looked more sad" and acted "real distant."  Chanish and Perez put a blanket outside for Kyis to play on, and they left the apartment door open so they could see him.  After dinner, Perez watched a college basketball game in the master bedroom on his cell phone.  Perez wore headphones and had the game "on full blast."  He watched the postgame show and "didn't come out of the room until close to 10:00."  Perez then went to the living room, and Chanish said she had already put Kyis to bed.  Chanish and Perez argued because Chanish wanted Perez to spend more time with her.  At about 10:30 p.m. Chanish said she was going to sleep.  She first went to the bathroom and then to Kyis's room for a few minutes to check on him.

Later that night Kyis came out of his bedroom and told Perez "his tummy was hurting."  Perez gave Kyis some water and told him to use the toilet if he had to throw up.  Kyis went to the bathroom and vomited "some yellow stuff."  Kyis then returned to his bedroom.

As Perez was falling asleep on the couch, he heard the door open again followed by a thud, and he saw Kyis on the ground outside his bedroom.  Perez ran to Kyis and grabbed him.  Perez panicked because Kyis was stiff and shaky, and his eyes "looked like they were turning in the back of his head."  Perez "was mostly yelling trying to get [Kyis] up," and then he yelled to

19

Chanish, who was in the master bedroom, to call 911. When the paramedics arrived, Perez escorted them into the apartment and led them to Kyis, who was on the bed in the master bedroom. The paramedics picked up Kyis and transported him and Chanish to the hospital. When Perez arrived at the hospital, he learned Kyis had died. Perez later saw Kyle, hugged him, and cried with him. Perez told Kyle "I am sorry, and I tried everything I could" because Perez had "tried doing CPR, mouth to mouth, trying to keep [Kyis] awake." Perez was "severely depressed" following Kyis's death.

The next day Officers Cuevas and Battles, a sheriff's deputy, and a social worker came to the apartment. Perez showed them around, including to where Kyis had collapsed. Perez was arrested a couple of weeks later. On November 20 he waived his *Miranda* rights and answered the detectives' questions for six to eight hours. Perez initially stated he never saw Chanish physically abuse Kyis. At some point, the detectives informed Perez that Kyis had died from blunt force trauma, and Perez realized he was a homicide suspect. The detectives told Perez he "was the only one awake" and therefore was "the only possible person." The detectives also said Chanish had accused him of killing Kyis. When one of the detectives asked Perez whether he had seen Chanish spank Kyis, he replied, "Yes, I've seen him spanked," saying it happened at the grandparents' house. The detective asked why, to which Perez answered, "Because he's kicking, swinging, scratching, and she just swang at him." Perez explained, "'Well, when she . . . gets mad, she grabs the arm. She pulls real hard sometimes. She gets real frustrated at me. She gets real mad sometimes towards him.'" Perez added, "'I remember she hit [Kyis] once, and she said she was trying to hit him on his butt but missed and got him on his

side. She said it was an accident, but she was mad. When she gets mad, she doesn't think.'" Perez testified the incident occurred when Kyis ran ahead of Chanish and Perez during a walk and "some guy in a truck pulled up and started giving Chanish crap about not watching him, and she got frustrated, and he was throwing a tantrum at the same time." However, Chanish only hit Kyis that one time.

Perez also told the detectives that Chanish took medication for anxiety and depression. On the night of November 6, Perez had to kick the bed to wake up Chanish. Perez admitted that when he yelled "'get your ass up now'" on the 911 call, it was directed at Chanish.

C.     *The Verdicts and Sentencing*

On March 10, 2020 the jury found Perez guilty of assault on a child causing death (§ 273ab, subd. (a); count 1) and felony child abuse (§ 273a, subd. (a); count 4). The jury found Chanish guilty of three counts of felony child abuse (§ 273a, subd. (a); counts 2-4). On June 10, 2020 the trial court sentenced Perez to an indeterminate term of 25 years to life on count 1 for assault on a child causing death, plus the upper term of six years on count 4 for felony child abuse. The court sentenced Chanish to an aggregate term of six years eight months, comprised of the middle term of four years on count 2, plus two consecutive terms of 16 months (one-third the middle term) on counts 3 and 4.

Chanish and Perez timely appealed.

21

## DISCUSSION

A.  *The Trial Court Did Not Abuse Its Discretion in Admitting Kyis's Statement Under Evidence Code Section 1360*

1.  *Proceedings below*

In February 2020 the prosecutor filed a motion in limine requesting Kyle be allowed to testify that on September 8, 2018 he observed a bruise on Kyis's groin area, and when Kyle asked what had happened, Kyis responded, "'Steve hit me in the night.'" The prosecutor argued Kyis's statemen was admissible pursuant to Evidence Code section 1360. In response, Perez filed a motion in limine objecting to admission of Kyis's statement. Perez argued Kyis's statement was unreliable because "Kyis tended to blame many different people for a wide variety of problems which were later confirmed to be not true."

At an evidentiary hearing on the motions, the parties stipulated Kyis was under the age of 12 and deceased, and therefore, he was unavailable. Kyle testified that on September 8, 2018 he noticed a bruise on Kyis's groin area when he helped Kyis remove his wet clothes after swimming. Kyle became upset when he saw Kyis's groin area, and he asked what had happened. In response, Kyis "blatantly said that Steve had punched him in the penis." Kyle then clarified that Kyis used the word "'privates'" instead of "'penis.'" Kyle admitted he later told officers Kyis said "'Steve hit me in the night.'"[16] Kyle observed Kyis was "nervous" and "shaken." Kyle believed Kyis was telling the truth because he "looked into [Kyle's] eyes and physically was

---

[16]  During cross-examination by Chanish's attorney, Kyle acknowledged he was not certain whether Kyis said "Steve had hit him in the night or Steve hit me in the penis."

shaken, [and] did not want [Kyle] to leave his side after he admitted that." After Kyis's disclosure, Kyle asked Lartigue to come to the bathroom to view the injury.[17]

Two days later Kyle and Kyis were interviewed at the Dos Palos Police Department. Kyle was present when Kyis told police officers and a CPS social worker that Perez had punched him at night. The officers tried to ask Kyis more questions, but Kyis "was getting a little bit nervous." Kyle told the officers that Kyis tended to ramble and had made statements about Perez that Kyle "put aside," including that Perez put Hot Cheetos in Kyis's eyes. Chanish later told Kyle that Kyis's groin injury was caused by Kyis falling on a trampoline or off a bunk bed at a friend's house.

Perez's attorney argued Kyis's statement was unreliable because his injury in the photograph looked "like something a child would get from falling off a trampoline or a bike." In addition, Kyis would say things "that weren't necessarily true," including accusing Kyle of hitting him.[18] Perez's attorney

---

[17] Although the motions in limine focused on Kyis's statement to Kyle, as discussed, Lartigue also testified at trial that she saw Kyis's groin injury and Kyis told her "Perez had went in his room at night and had punched him in his groin."

[18] In response to questioning by Perez's attorney as to whether police officers asked Kyle about Kyis's allegation that Kyle had hit him, Kyle denied the allegation was true. Alejandra testified with respect to the October 2018 bruise on Kyis's jaw that Kyis initially said a school friend hit him with a toy, but he later said Kyle hit him because Kyis broke a piece of his bike.

asserted the statement was "extremely prejudicial" and Perez could not get a fair trial if the statement were admitted.

The trial court found the photograph of Kyis's injury was corroborating physical evidence Kyis was injured. The court acknowledged there was no showing that Kyis knew the difference between a truth and a lie. However, Kyis's statement that Perez hit him was spontaneous because it was in response to Kyle asking "'[w]hat is this,'" and Kyle did not prompt Kyis by asking "'[w]ho did this.'" The court added, "I don't have any motive Kyis would have to lie about how he received that injury, and he did repeat it two times. I mean, he said it once to his dad and then later, evidently, to the police and to CPS, so I believe under [Evidence Code section] 1360 that is a reliable statement that should go in front of the jury, and they can decide if they believe it or not, but they should at least hear that statement."

2. *Governing law and standard of review*

Evidence Code section 1360, subdivision (a), provides, "In a criminal prosecution where the victim is a minor, a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another, or describing any attempted act of child abuse or neglect with or on the child by another, is not made inadmissible by the hearsay rule if all of the following apply: [¶] (1) The statement is not otherwise admissible by statute or court rule. [¶] (2) The court finds, in a hearing conducted outside the presence of the jury, that the time, content, and circumstances of the statement provide sufficient indicia of reliability. [and] [¶] (3) The child either: [¶] (A) Testifies at the proceedings. [or] [¶] (B) Is unavailable as witness, in which case, the statement may be admitted only if there is evidence of child abuse or neglect that

24

corroborates the statement made by the child." (Accord, *People v. Roberto V.* (2001) 93 Cal.App.4th 1350, 1367 [noting Evidence Code section 1360 "safeguards the reliability of a child's hearsay statements"].)

Factors "relevant to the reliability of hearsay statements made by child witnesses" include "(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) use of terminology unexpected of a child of a similar age; and (4) lack of motive to fabricate." (*In re Cindy L.* (1997) 17 Cal.4th 15, 29-30; accord, *In re Lucero L.* (2000) 22 Cal.4th 1227, 1239.) "[E]ven if the child was incompetent to testify at trial because he or she did not understand the duty to tell the truth, this [does] not necessarily render the child's hearsay statements unreliable, but [is] merely a factor to consider." (*People v. Brodit* (1998) 61 Cal.App.4th 1312, 1330; accord, *Cindy L.*, at p. 34.)

We review for an abuse of discretion a trial court's admission of evidence under Evidence Code section 1360. (*People v. Mitchell* (2020) 46 Cal.App.5th 919, 927; *People v. Roberto V., supra*, 93 Cal.App.4th at p. 1367.)

### 3. *The trial court did not abuse its discretion in admitting Kyis's statement to Kyle*

The trial court did not abuse its discretion in admitting Kyis's statement that Perez hit him. The statement was corroborated by the photograph of Kyis's injury, as required under Evidence Code section 1360, subdivision (a)(3)(B), when a child is unavailable to testify. (See *In re Cindy L., supra*, 17 Cal.4th at p. 35 ["Corroborative evidence in this context is ""evidence . . . which would support a logical and reasonable inference"" that the act of abuse described in the hearsay statement occurred.""].) Perez argues Kyis's statement was not

spontaneous because it was in response to Kyle asking him what had happened. But as the trial court noted, Kyle did not prompt Kyis to cast blame on another person by asking who caused the injury. Perez also asserts Kyis had a motive to fabricate an allegation against him because Kyis wanted to spend more time with his father. However, the record does not show that at the time Kyis preferred to spend time with Kyle, and even if he did, that Kyis had the sophistication to make up an abuse allegation to make it happen.

Further, Kyle's description of the circumstances of Kyis's statement—that Kyis was "[n]ervous" and "shaken" and did not want Kyle to leave his side—was consistent with the statement. Moreover, regardless of whether Kyis said "Steve hit me in the night" or hit him in his "'privates,'" Kyis's language was appropriate for a four-year-old child. Accordingly, the "time, content, and circumstances surrounding" Kyis's statement provided sufficient indicia of reliability under Evidence Code section 1360.

B.   *The Trial Court Did Not Abuse Its Discretion in Admitting the Autopsy Photograph*

1.   *Proceedings below*

Perez filed a motion in limine requesting all autopsy photographs be excluded pursuant to Evidence Code section 352. At a pretrial hearing, the prosecutor moved to introduce one autopsy photograph (exhibit 102) to "use it with Dr. Super as a demonstrative so he can describe where the injuries were on Kyis" that he observed during the autopsy. The court responded, "A lot of times he'll use diagrams. But one photo doesn't seem too much, if I could look at it and see. Obviously, it's disturbing, but it doesn't seem unduly gruesome." The prosecutor stated she did

26

not "select any photos where it shows any part of examination, internal examination, or anything, what I feel to be unduly prejudicial or inflammatory." The court ruled the photograph was admissible.

2.     *Governing law and standard of review*

"'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."'" (*People v. Hardy* (2018) 5 Cal.5th 56, 87; accord, *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 822.) "'The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury.' (Evid. Code, § 352.)" (*Hardy*, at p. 87; accord, *People v. Bell* (2019) 7 Cal.5th 70, 105.)

"'[T]he prejudice which exclusion of evidence under Evidence Code section 352 is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence. "[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. The stronger the evidence, the more it is 'prejudicial.' The 'prejudice' referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.'" (*People v. Jones* (2017) 3 Cal.5th 583, 610; accord, *People v. Bell, supra*, 7 Cal.5th at p. 105.)

"So long as the probative value of graphic or disturbing material is not substantially outweighed by its prejudicial effects, a prosecutor is entitled to use such evidence to 'present a

27

persuasive and forceful case.'" (*People v. Merriman* (2014) 60 Cal.4th 1, 80; accord, *People v. Steskal* (2021) 11 Cal.5th 332, 357 ["Graphic evidence in a murder case is always disturbing [citation] but it is not inadmissible simply because it is unpleasant to view."]; *People v. Booker* (2011) 51 Cal.4th 141, 171.) "'The admission into evidence of photographs lies within the trial court's discretion and will not be disturbed absent an abuse of that discretion.'" (*People v. Avila* (2014) 59 Cal.4th 496, 518; accord, *People v. Chism* (2014) 58 Cal.4th 1266, 1304.)

### 3. *The trial court did not abuse its discretion in admitting the autopsy photograph*

Perez contends the trial court abused its discretion in admitting the autopsy photograph because it was inflammatory, Kyis's cause of death was not disputed, and other photographs depicting Kyis's prior injuries were admitted into evidence. However, "'"[a]s a rule, the prosecution in a criminal case involving charges of murder or other violent crimes is entitled to present evidence of the circumstances attending them even if it is grim" [citation], and even if it "duplicate[s] testimony, depict[s] uncontested facts, or trigger[s] an offer to stipulate."'" (*People v. Fayed* (2020) 9 Cal.5th 147, 196 [although there was no dispute victim was stabbed to death and defense counsel offered to stipulate that bloody shirt and pants belonged to victim, trial court did not abuse its discretion in admitting photographs of victim's bloody clothes]; accord, *People v. Boyce* (2014) 59 Cal.4th 672, 687-688.)

Here, the autopsy photograph was used during the direct examination of Dr. Super to support his testimony about Kyis's external bruises at the time of the autopsy. (See *People v. Roundtree* (2013) 56 Cal.4th 823, 852 ["We have consistently

28

upheld the admission of autopsy photographs disclosing how the victim was wounded as being relevant to the question of deliberation and premeditation, as well the appropriate penalty."]; *People v. Riggs* (2008) 44 Cal.4th 248, 304 [autopsy photograph was admissible to "corroborate the testimony of the forensic pathologist"].)  We have reviewed the autopsy photograph, which is not unusually inflammatory (showing a deceased child with bruises, not any open wounds or blood), and conclude the trial court did not abuse its discretion in finding it was more probative than prejudicial.

C.      *The Trial Court Did Not Commit Prejudicial Error in Its Instructions on the Lesser Included Offenses as to Count 1*

1.      *Duty to instruct on lesser included offenses*

"Under California law, trial courts must instruct the jury on lesser included offenses of the charged crime if substantial evidence supports the conclusion that the defendant committed the lesser included offense and not the greater offense." (*People v. Gonzalez* (2018) 5 Cal.5th 186, 196 (*Gonzalez*); accord, *People v. Landry* (2016) 2 Cal.5th 53, 96.)  "That duty exists because of the right under the California Constitution '"to have the jury determine every material issue presented by the evidence."'"  (*Gonzalez*, at p. 196; accord, *People v. Breverman* (1998) 19 Cal.4th 142, 155.)  "The prejudice arising from the failure to give such instructions is the risk that the jury ignored its instructions and convicted the defendant of an offense . . . for which the prosecution did not carry its burden.  The jury might have been convinced that the defendant was guilty of some lesser included offense and, as a result, tempted to convict of a greater offense rather than acquit."  (*Gonzalez*, at p. 200; accord, *People v. Eid* (2014) 59 Cal.4th 650, 657.)

29

"The erroneous failure to instruct on a lesser included offense generally is subject to harmless error review under the standard of *People v. Watson* (1956) 46 Cal.2d 818, at pages 836-837.  Reversal is required only if it is reasonably probable the jury would have returned a different verdict absent the error or errors complained of."  (*People v. Prince* (2007) 40 Cal.4th 1179, 1267; accord, *Gonzalez, supra*, 5 Cal.5th at p. 196 ["The failure to instruct on lesser included offenses supported by substantial evidence was state law error."].)

2.      *Proceedings below*

At the pretrial hearing on jury instructions, the trial court reviewed the proposed jury instructions with the attorneys.  Perez's attorney stated the proposed jury instructions were acceptable.[19]  The court instructed the jury with modified

---

[19]      In their respondent's brief, the People contend Perez forfeited his claims of instructional error because his attorney did not object to the instructions or request any modifications.  However, a trial court has a sua sponte duty to instruct on lesser included offenses where the evidence raises a question whether all the elements of the charged offense were present.  (*People v. Breverman, supra*, 19 Cal.4th at p. 154.)  Further, we review any claim of instructional error that affects a defendant's substantial rights whether or not trial counsel objected.  (§ 1259 ["The appellate court may also review any instruction given . . . even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."]; *People v. Burton* (2018) 29 Cal.App.5th 917, 923 ["'Failure to object to instructional error forfeits the issue on appeal unless the error affects defendant's substantial rights.'"]; *People v. Bedolla* (2018) 28 Cal.App.5th 535, 544 [same].)  And "[w]e can only determine if [a] defendant['s] substantial rights were affected by

CALCRIM No. 3517 as to the lesser included offenses: "If all of you find that a defendant is not guilty of a greater crime, you may find him or her guilty of a lesser crime. If you are convinced beyond a reasonable doubt that the defendant is guilty of that lesser crime, a defendant may not be convicted of both a greater and a lesser crime for the same conduct. Now I will explain to you the crimes affected by this instruction. Attempted assault on a child causing death is a lesser crime of assault on a child causing death, charged in count 1. Assault by means of force likely to produce great bodily injury is a lesser crime of assault on a child causing death, charged in count 1. Simple assault is a lesser crime of assault on a child causing death, charged in count 1."

The court also instructed the jury with modified CALCRIM No. 460: "Attempted assault on a child causing death is a lesser crime to assault on a child causing death. To prove that a defendant is guilty of attempted assault on a child causing death, the People must prove that, one, the defendant took a direct but ineffective step towards committing . . . assault on a child causing death; and, two, the defendant intended to commit attempted assault on a child causing death." The court also instructed on what is required to prove a direct step toward committing an assault on a child causing death.

_____

deciding whether the instruction was given in error and, if so, whether the error was prejudicial." (*People v. Medina* (2019) 33 Cal.App.5th 146, 154, fn. 7.) That is, if Perez's claims have merit, they have not been forfeited. We therefore necessarily review the merits of Perez's contention the instructions violated his rights. Because we find no forfeiture, we do not reach Perez's argument his attorney's failure to object constituted ineffective assistance of counsel.

The trial court did not initially instruct the jury with CALCRIM No. 875 on assault with force likely to produce great bodily injury. However, the jury initially deadlocked on count 1, and the court discharged juror no. 2 (who indicated he could no longer serve) and replaced him with an alternate. At that point, the jury foreperson inquired where the instruction was for the lesser included offense of assault with force likely to produce great body injury. Perez's counsel stated he had no objection to the court instructing the jury with CALCRIM No. 875, and the court proceeded to read the instruction to the jury.

3. *The trial court did not commit prejudicial error in instructing the jury on attempted assault on a child causing death*

Perez contends the trial court erred in instructing the jury on attempted assault on a child causing death as a lesser included offense of count 1 because the offense is not a crime in California, relying on *In re James M.* (1973) 9 Cal.3d 517, 522 (attempted assault with a deadly weapon on a police officer is not a crime) and *People v. Duens* (1976) 64 Cal.App.3d 310, 314 (attempted assault with intent to commit rape is not an offense). The *James M.* court explained attempted assault was not a "logical absurdity," but the assault statute showed a clear legislative intent not to punish an attempt to commit a battery without the present ability to do so (an attempted assault). (*James M.* at pp. 521-522.)

Even assuming it was error for the trial court to instruct on attempted assault on a child causing death, Perez has failed to show prejudice. As discussed, a defendant may be prejudiced by the failure to instruct the jury on a lesser included offense because of the possibility the jury would convict the defendant of

32

a greater offense even if the elements had not been proven, rather than acquit. (*Gonzalez, supra*, 5 Cal.5th at p. 200.) But here, the jury was offered the option to convict Perez of the lesser included offense. Thus, there is no risk the jury convicted him of the greater offense to avoid an acquittal.

4.      *The trial court did not commit prejudicial error in its delayed instruction on assault with force likely to produce great bodily injury*

Perez contends the trial court erred in failing initially to instruct the jury with CALCRIM No. 875 for assault with force likely to produce great bodily injury, which is a lesser included offense of assault on a child causing death. As discussed, the court initially instructed the jury that assault by means of force likely to produce great bodily injury is a lesser included offense of the assault charged in count 1. However, it is undisputed the court inadvertently failed initially to instruct the jury with CALCRIM No. 875. Once the jury foreperson notified the court that the jury had not been instructed on assault by means of force likely to produce great bodily injury, the court rectified its error by giving the instruction.

Perez contends he was prejudiced by the initial omission of CALCRIM No. 875 because the deadlocked jury did not have the instruction during its 10 hours of deliberation and would have "reached a more favorable verdict" on count 1 had it been properly instructed. But to demonstrate prejudice, Perez needed to have submitted juror declarations to show it was reasonably probable the deadlocked jury would have found Perez guilty of the lesser included offense of assault with force likely to produce great bodily injury had the jury been instructed with CALCRIM No. 875. Perez did not submit any declarations. We recognize

33

the most relevant juror declarations would have been inadmissible, for example, hypothetically, a declaration from juror no. 2 explaining that he voted not guilty of assault on a child causing death and would have voted guilty of the lesser included offense had he been properly instructed.  (See Evid. Code, § 1150, subd. (a) ["Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.  No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."].)

As the Supreme Court explained in *People v. Gonzales* (2012) 54 Cal.4th 1234, 1281, "'This statute distinguishes "between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved. . . ." [Citation.]  "This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent.  The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration."'"  (Accord, *People v. Flores* (2021) 70 Cal.App.5th 100, 108 [statements in juror declarations as to jurors' subjective understandings were inadmissible, but statements as to what was said in the jury room relating to punishment were admissible because they were made "out loud,

34

heard by all the jurors, and involved information that could have influenced the verdict"].)

Although arguably a juror could state what an oral vote count in the jury room was at the time of the deadlock (whether 10 jurors voted guilty or not guilty), absent information on how juror no. 2 voted and how he would have voted on the lesser offense, it is speculation whether juror no. 2 would have voted guilty of the lesser offense and would have been able to convince the other 11 jurors (who later voted guilty on the greater offense after they were instructed with CALCRIM No. 875) to vote not guilty of the greater offense and guilty of the lesser offense. Perez has therefore not met his burden under *Watson* to demonstrate prejudice. (See *People v. Hernandez* (2011) 51 Cal.4th 733, 746 ["This requirement that the defendant demonstrate actual prejudice is consistent with the defendant's burden under *Watson, supra*, 46 Cal.2d at page 837, to establish a reasonable probability that error affected the trial's result."].)

A comparison of the two jury instructions supports our conclusion. Three of the differences between the instructions on assault causing death of a child (CALCRIM No. 820) and assault likely to produce great bodily injury (CALCRIM NO. 875) are not in dispute (assuming Perez was the perpetrator): the People must prove (1) the defendant had care or custody of a child who was under the age of eight; (2) the force was applied to a child; and (3) the defendant's act caused the child's death. The only significant difference between the two instructions is that to prove an assault causing death of a child, the People must prove that "[w]hen the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in *great bodily injury to the child*." (CALCRIM No. 820, italics added.) By contrast, for

assault likely to produce great bodily injury, the People must prove "[w]hen the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in *the application of force to someone*." (CALCRIM No. 875, italics added.)

The evidence at trial does not support a finding that Perez was aware of facts that would lead a reasonable person to realize his conduct in kicking or punching Kyis in the abdomen would have resulted in the application of force, but not great bodily injury. Dr. Super testified to the significant injuries suffered by Kyis, including a tear in his mesentery, a lacerated liver, bruises on his small bowel and both lungs, and bruises on both sides of his abdomen and chest. According to Dr. Super, Kyis died from bleeding in his abdomen due to a blunt impact likely caused by one or more punches or kicks. Further, given the nature of the injuries, a child "would cry bloody murder if somebody hit [him] that hard in the abdomen," causing the child to die within three hours. There was no expert testimony to the contrary. Therefore, it is not reasonably probable the jury would have returned a not guilty verdict of the greater offense had it been given the option to convict Perez of the lesser offense based a finding he was aware (through the lens of a reasonable person) that kicking or punching Kyis hard in the abdomen, causing Kyis to scream in pain, would have resulted in the application of force, but not great bodily injury.[20]

---

[20] Perez also argues the trial court erred in instructing the jury with CALCRIM No. 251 that the offense of assault on a child causing death is a specific intent instead of general intent crime. But as Perez concedes, instructing the jury that specific intent was required to prove the offense was not prejudicial error

D.    *The Trial Court Erred in Instructing the Jury on Criminal Negligence with Respect to the Offense of Felony Child Abuse Charged in Count 4 as to Perez, but the Error Was Harmless*

1.    *Proceedings below*

With respect to felony child abuse charged in count 4 (§ 273a, subdivision (a)), the trial court instructed the jury with a modified version of CALCRIM No. 253:  "For you to find a person guilty of the crime of child abuse as charged in Counts 2, 3 and 4, a person must do an act or fail to do an act with criminal negligence.  Criminal negligence is defined in the instructions on that crime."

The court instructed the jury further with modified CALCRIM No. 821:  "The defendants are charged with child abuse likely to produce great bodily harm or death in violation of Penal Code section 273a(a).  To prove that a defendant is guilty of this crime, the People must prove that, one, the defendant, while having care or custody of a child, willfully caused or permitted the child's person or health to be injured; two, the defendant inflicted pain or suffering on the child or caused or permitted the child to suffer or be injured or be endangered under circumstances or conditions likely to produce great bodily harm or death; and three, the defendant was criminally negligent when he or she caused or permitted the child to be injured."

The court instructed further, "Criminal negligence involves more than ordinary carelessness, inattention, or mistake in judgment.  A person acts with criminal negligence when, one, he

_____

because it increased the People's burden.  The instruction of the jury with CALCRIM No. 251 was likewise not prejudicial as to the lesser included offenses.

or she acts in a reckless way that is a gross departure from the way an ordinarily careful person would act in the same situation; two, the person's acts amount to disregard for human life or indifference to the consequences of his or her acts; and, three, a reasonable person would have known that acting in that way would naturally and probably result in harm to others."

In her closing argument, the prosecutor stated as to count 4: "[B]oth defendants are charged with felony child abuse on or between September 1 and September 8. And that would have been the injury to Kyis's groin. I start here because I know there is some overlap in these charges, and so I wanted to explain, up front, that there are different ways to hold people accountable for these crimes. Ms. Conrady is charged with child abuse because she had care and custody of Kyis on all of these dates. And she allowed him to be placed in a position in which he suffered harm likely to cause great bodily injury. That is why she's charged. Mr. Perez is charged with actually causing these injuries in early September and then on November 6 when Kyis was killed." The prosecutor added as to count 4, "For this count, [Perez] is charged with willfully causing or permitting the child to be placed in a situation where his health was in danger, that he inflicted pain or suffering on the child or caused or permitted him to suffer and be injured under circumstances likely to cause great bodily injury. And he was—and that he was criminally negligent when he or she caused or permitted the child to be injured. . . . And [Perez] is the one who did it."

2. *The trial court erred in instructing the jury on count 4 as to Perez*

"Section 273a, subdivision (a) 'is an omnibus statute that proscribes essentially four branches of conduct.' [Citation.] As

relevant here, it provides: 'Any person who, under circumstances or conditions likely to produce great bodily harm or death, [1] willfully causes or permits any child to suffer, or [2] inflicts thereon unjustifiable physical pain or mental suffering, or [3] having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or [4] willfully causes or permits that child to be placed in a situation where his or her person or health is endangered, shall be punished by imprisonment in a county jail not exceeding one year, or in the state prison for two, four, or six years.'" (*People v. Valdez* (2002) 27 Cal.4th 778, 783 (*Valdez*), fn. omitted; accord, *People v. Flores* (2016) 2 Cal.App.5th 855, 873.) "Violation of section 273a, subdivision (a), '"can occur in a wide variety of situations: the definition broadly includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect."'" (*Valdez*, at p. 784; accord, *People v. Sargent* (1999) 19 Cal.4th 1206, 1215-1516.) "[W]hen the conduct at issue involves the direct infliction of unjustifiable physical pain or mental suffering on a child, criminal negligence is not an element of the offense. Rather, the defendant must have a mens rea of general criminal intent to commit the proscribed act." (*Sargent*, at p. 1224; accord, *Valdez*, at p. 786.)

Perez argues the trial court erroneously instructed the jury on felony child abuse as charged in count 4 against him. We agree. Perez's liability for felony child abuse was based on the theory Perez willfully inflicted the groin injury on Kyis. As the prosecutor argued, "Mr. Perez is charged with actually causing these injuries in early September," and further, he "is the one who did it." Because the People argued Perez was liable for directly inflicting physical pain on Kyis, as the *Sargent* court and CALCRIM No. 821 make clear, the People had to prove Perez had

a mens rea of general criminal intent to commit the prohibited act.  (See *People v. Sargent, supra*, 19 Cal.4th at p. 1224.)  Yet the trial court instructed on criminal negligence, not general criminal intent.[21]

3. *The instructional error is not prejudicial under* Chapman

"Among the constitutional errors subject to [*Chapman v. California* (1967) 386 U.S. 18] review is misinstruction of the jury on one or more elements of the offense."  (*People v. Hendrix* (2022) 13 Cal.5th 933, 942 [under *Chapman*, "[t]his 'stricter' standard of review requires reversal unless the error is 'harmless beyond a reasonable doubt'"]; accord, *People v. Wilkins* (2013) 56 Cal.4th 333, 351.)  "This is because the federal Constitution requires 'criminal convictions to rest upon a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt."  [Citations.]  A

---

[21]  The People argue the trial court properly instructed on criminal negligence because the court instructed the jury on CALCRIM No. 821, alternative C—that "[t]he defendant, while having care or custody of a child, willfully caused or permitted the child's person or health to be injured"—and thus the jury was correctly instructed on criminal negligence, which applies to this alternative.  The People are correct that the court instructed with alternative C, but the People's theory of the case as expressed in the prosecutor's closing argument was that it was Perez who inflicted unjustifiable physical pain on Kyis (alternative A) ("[t]he defendant willfully inflicted unjustifiable physical pain or mental suffering on a child"), with Conrady permitting Kyis to be injured (alternative C).  Therefore, the court should have instructed on general criminal intent as to felony child abuse charged against Perez.

40

jury misinstruction that relieves the prosecution of its burden to prove an element of the crime—by either misdescribing the element or omitting it entirely—violates this requirement." (*Hendrix*, at p. 942; accord, *Neder v. United States* (1999) 527 U.S. 1, 10 ["In both cases—misdescriptions and omissions— the erroneous instruction precludes the jury from making a finding on the *actual* element of the offense."].)

The trial court's misinstruction on the mens rea of the felony child abuse charge against Perez was harmless beyond a reasonable doubt under *Chapman*. A defendant has general criminal intent if he "intended to do the proscribed act." (*People v. Atkins* (2001) 25 Cal.4th 76, 82 ["'When the definition of a crime consists of only the description of a particular act, without reference to intent to do a further act or achieve a future consequence, we ask whether the defendant intended to do the proscribed act. This intention is deemed to be a general criminal intent.'"]; accord, *People v. Hering* (1999) 20 Cal.4th 440, 445.) The only evidence at trial as to the cause of Kyis's groin injury was Kyis's statements to Kyle, Lartigue, and the police officers and social worker that Perez hit him. There was no evidence the injury occurred accidentally or that Chanish inflicted the injury while Kyis was in Perez's care. Although Perez in his testimony denied he ever hit Kyis in his groin area (or anywhere), Perez also denied he ever saw Chanish "mistreat Kyis to cause that bruise." Given the evidence of Kyis's multiple statements that Perez hit him and the photograph of the significant bruising to Kyis's groin area (exhibit 101), the jury necessarily found Perez hit Kyis in the groin with the intent "to do the proscribed act" (inflict the injury). (*Atkins*, at p. 82; accord, *Hering*, at p. 445.) Accordingly, the People have met their burden to show beyond a reasonable doubt that the error in failing to instruct on general

41

criminal intent did not contribute to the verdict. (*People v. Hendrix, supra*, 13 Cal.5th at p. 942; *People v. Wilkins, supra*, 56 Cal.4th at p. 351.)

E.    *The Trial Court Did Not Abuse Its Discretion in Directing Further Jury Deliberations and Did Not Commit Prejudicial Error in Discharging Juror No. 2*

1.    *Proceedings below*

The jury began deliberations on Wednesday, March 4, 2020 at 3:35 p.m., and deliberated for approximately an hour. The jury resumed deliberations at 9:05 a.m. the following day, continued until just before noon, then left for the day. On Friday, March 6, the jury resumed deliberations just after 9:00 a.m. At 11:39 a.m. the jury requested readback of the testimony of Perez and Dr. Super. The court wrote in response, "'OK, it may take a little while. Also, if any of you are not available this afternoon or next week, please let me know now.'" The jury sent a note back stating, "'Juror 2 not available next week.'" The court then took a lunch recess. After lunch, the court reporter read back the testimony of Perez and Dr. Super (from approximately 1:20 to 3:20 p.m.).

Just after 4:00 p.m. the jury sent a note to the trial court stating, "We have a verdict on counts 2, 3 & 4. [¶] We cannot reach agreement on Count 1." (Capitalization omitted.) The court called the attorneys on the record and notified them of the jury's note. The court stated in part, "I don't think they have been deliberating long enough. I would tell them to deliberate further, but I wanted to get counsel's input." The prosecutor responded, "I don't think they've deliberated that long, because they were out yesterday afternoon." Chanish's attorney queried, "The concern I have, is, are we going to lose a juror on Monday?"

The court replied, "Well, we can bring an alternative in." Chanish's attorney responded, "Well then they have to start deliberations over." The prosecutor indicated she wanted to obtain more information from the jury. The court asked Perez's attorney, and he replied, "I'm not sure, Your Honor. I'll do whatever the court wants to do." The court then asked the attorneys to return to the courtroom so the jury could be brought out and questioned.

When the attorneys returned to the courtroom, the trial court stated its intent to question the jury and then "have them go back in and we can discuss further what we want to do." The jury was brought into the courtroom, and the court asked the foreperson, "Do you think any further deliberations would help you or any reading back of other testimony?" The foreperson responded, "We did try that, and, no, I do not believe—because we tried approaching it from all different options; yes." The court then asked, "Do any of the other jurors feel that any further read-back or further deliberations would help you reaching a verdict on count 1?" No juror raised a hand. Next, the court asked, "Foreperson, without telling me which way, if you can tell me how many ballots have you taken?" The foreperson stated the jury had taken approximately four ballots on count 1, and the split in votes "started out one to 11, and ended up two to ten." The court then sent the jury back to the jury room for further deliberations.

Outside the presence of the jury, the trial court noted the jury had deliberated for approximately nine hours (not including

43

the hour of deliberations on March 4).[22]  The prosecutor stated, "In my experience, when a split is this close and they haven't been deliberating for a significant period of time—I guess, especially compared to the length of the tria1—is that the judge would usually send them back to further deliberate, but I would submit it on that, Your Honor."  Perez's attorney stated, "Your honor, I don't have any thoughts on the matter."

Chanish's attorney expressed concern that if the deliberations went to Monday, there would be "one or two new jurors, and if those jurors are not the two people that are holding out, we're going to be in the same position we are in now, with maybe a different [c]ount."  The court responded, "That's why I wouldn't have alternates in because I think it's going to change the dynamic.  It's just—my concern is I don't believe they have actually been deliberating long enough, given the length of the trial.  And unfortunately, since we ran over time, we're running into time constraints.  But that is the purpose of the alternates, and I realize they have reached verdicts on 2, 3, and 4, but unless those verdicts have been received and recorded, they could still start deliberations all over again."  The prosecutor argued the verdicts should not be recorded "because then you're having a different jury decide part of the case," and the court agreed.

---

[22]    The trial court observed the jury deliberated for three hours on March 5 and six hours on March 6.  The court noted it had recessed at approximately 3:30 p.m. on March 4, but it did not address the jury's deliberations reflected in the record for March 4.  For purposes of our discussion, we use the 10-hour estimate made by Perez in his opening brief that includes the March 4 deliberations.  We note the 10-hour estimate includes the two-hour readback of Perez's and Dr. Super's testimony.

The jury returned to the courtroom, and the trial court told the jurors they needed to continue deliberating. The court inquired whether any juror could not come back the following week, and juror no. 2 indicated he would not be available. The court stated, "So at this time, the juror in seat number two, I'll excuse you. We'll randomly select an alternate to come in and take your spot, and then we'll resume deliberations, and when the alternate comes in next week, I'll give you further instructions on how to do that." After the jury decided to return on Tuesday, the court told juror no. 2, "I appreciate your service. Unfortunately, we ran long, and so it ran into your schedule, but I do appreciate the time you put in."

On Tuesday morning, March 10, the trial court swore in an alternate juror. The court instructed the jury to disregard its prior deliberations and start deliberations from the beginning. After further discussions in the courtroom, the jury resumed its deliberations at 9:23 a.m. At 2:25 p.m. the jury indicated it had reached verdicts on all counts. The jury returned verdicts of guilty on all counts as to Perez and Chanish.

2. *The trial court did not abuse its discretion in directing further jury deliberations*

Section 1140 provides, "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree." "The determination whether there is a reasonable probability of agreement rests within the sound discretion of the trial court.

45

[Citation.] 'Although the court must take care to exercise its power without coercing the jury into abdicating its independent judgment in favor of considerations of compromise and expediency [citation], the court may direct further deliberations upon its reasonable conclusion that such direction would be perceived "'as a means of enabling the jurors to enhance their understanding of the case rather than as mere pressure to reach a verdict on the basis of matters already discussed and considered.'"'" (*People v. Harris* (2005) 37 Cal.4th 310, 363-364; accord, *People v. Peoples* (2016) 62 Cal.4th 718, 783 ["the trial court's statement that 21.5 hours of deliberation was a 'drop in the bucket'" was not coercive]; *People v. Pride* (1992) 3 Cal.4th 195, 265 [it was not coercive for the court after a week of deliberations on the penalty phase of a death penalty case to order further deliberations where vote remained at 11 to 1].)

Perez contends the trial court coerced the jury to reach a verdict by telling the jurors they had not deliberated long enough after 10 hours of deliberation. However, the court did not make any statement to pressure the jury to reach a verdict. The court appropriately concluded there was a reasonable probability the jury could reach an agreement because the jury was actively deliberating. According to the foreperson, after taking four ballots on count 1, the split in votes changed from 11 to one to 10 to two. Although the change in votes shows the jury was moving away from unanimity, it also demonstrates the jury was continuing to deliberate. Further, it was not an abuse of discretion, after eight days of trial testimony and counsel's argument on multiple counts against two defendants, for the court to conclude after approximately 10 hours of jury deliberations that further deliberations could be fruitful. (See *People v. Debose* (2014) 59 Cal.4th 177, 209 [trial court did not

46

abuse its discretion in denying mistrial motion where "the jury had only been deliberating for a day and a half *as to three defendants*, after a trial that had lasted two months"]; *People v. Bell* (2007) 40 Cal.4th 582; 617 ["the jury in this case had deliberated less than two full days, around 10 hours; we have upheld courts' denials of mistrials even after fruitless deliberations for longer periods"], disapproved on other grounds in *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; *People v. Cook* (2006) 39 Cal.4th 566, 615 [no abuse of discretion where trial court ordered a deadlocked jury, which had deliberated for a day and a half, to continue deliberating for the afternoon].)

### 3. *The trial court's discharge of Juror No. 2 was not prejudicial error*

During voir dire, juror no. 2 asked the trial court, "I just had a question on . . . the length of the trial, because I have some commitments, like, after March the 8th." The court responded, "No, we'll be done before then. I estimated February 28th, and that was—I tried to build in a little bit of padding into it, so I'm sure that you would be fine, and we'll have alternates, so if something does come and you're unavailable, there would be a juror that would substitute in for you." Juror no. 2 replied, "No, I'm fine until then, so I just wanted to make sure until I know where I'm at." The trial ran longer than expected, and the jury did not begin deliberations until March 4. As discussed, on the afternoon of Friday, March 6 juror no. 2 indicated he would not be available the following week. The court discharged juror no. 2 and replaced him with an alternate juror.

"The trial court may discharge a juror at any time if good cause exists to find that the juror is unable to perform his or her duty. (§ 1089.) 'The trial court's decision whether or not to

47

discharge a juror under section 1089 is reviewed for abuse of discretion and will be upheld if supported by substantial evidence; to warrant discharge, the juror's bias or other disability must appear in the record as a demonstrable reality.' [Citation.] A reviewing court does not reweigh the evidence but 'must be confident that the trial court's conclusion is manifestly supported by evidence on which the court actually relied.'" (*People v. Lopez* (2018) 5 Cal.5th 339, 365; accord, *People v. Landry, supra*, 2 Cal.5th at pp. 88-89; *People v. Holloway* (2004) 33 Cal.4th 96, 124-125.)

The trial court did not inquire into the reason for juror no. 2's unavailability after March 8. Although a juror's unavailability to serve on the jury would constitute good cause for discharge, it may well have been that juror no. 2 had a doctor's appointment, a work commitment, or other short-term unavailability after March 8 that could have been accommodated. Further, the court did not expressly state its reasons for discharging juror no. 2 other than the juror's general statement he was not available. Because the record does not reflect good cause for discharging juror no. 2, the court abused its discretion.[23] However, Perez has failed to establish he was prejudiced by discharge of the juror under the *Watson* harmless error standard. (See *People v. Henderson* (2022) 78 Cal.App.5th 530, 566-567

---

[23] We recognize the trial court informed juror no. 2 that if the trial ran past March 8, the court would replace him with an alternate. Thus, the juror had a reasonable expectation he would not have to serve after that date. However, the court's statement was made without inquiry into the reason for the juror's unavailability, and it cannot take precedence over Perez's right to have the jury decide the case absent good cause for discharge of the juror.

48

[applying *Watson* harmless error standard to discharge of juror without good cause]; *People v. Bowers* (2001) 87 Cal.App.4th 722, 735 [same].)  There is no evidence as to how juror no. 2 voted when the jury deadlocked on count 1, voting 11 to one and then 10 to two.  Further, Perez does not contend the alternate juror was biased or incompetent.  Perez "has a right to jurors who are qualified and competent, not to any particular juror."  (*People v. Tate* (2010) 49 Cal.4th 635, 672.)  Therefore, Perez has not shown it is reasonably probable that had juror no. 2 not been excused, Perez would have obtained a more favorable verdict.  (*Henderson, supra*, 78 Cal.App.5th at p. 567; *Bowers, supra*, 87 Cal.App.4th at p. 735.)

F.    *Substantial Evidence Supports the Convictions Except for Felony Child Abuse Charged in Count 4 as to Chanish*
      1.    *Standard of review*
      "When a defendant challenges the sufficiency of the evidence for a jury finding, we review the entire record in the light most favorable to the judgment of the trial court.  We evaluate whether substantial evidence, defined as reasonable and credible evidence of solid value, has been disclosed, permitting the trier of fact to find guilt beyond a reasonable doubt." (*People v. Vargas* (2020) 9 Cal.5th 793, 820; accord, *People v. Penunuri* (2018) 5 Cal.5th 126, 142 (*Penunuri*) ["'To assess the evidence's sufficiency, we review the whole record to determine whether *any* rational trier of fact could have found the essential elements of the crime or special circumstances beyond a reasonable doubt.'"].)  "'"Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of

the facts upon which a determination depends.  [Citation.]  We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence.""" (*Penunuri*, at p. 142; accord, *People v. Mendez* (2019) 7 Cal.5th 680, 703.)

"""The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence.""" (*People v. Vargas, supra*, 9 Cal.5th at p. 820; accord, *People v. Rivera* (2019) 7 Cal.5th 306, 324.)  "'We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence.  [Citation.]  If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.'" (*People v. Westerfield* (2019) 6 Cal.5th 632, 713 (*Westerfield*); accord, *Penunuri, supra*, 5 Cal.5th at p. 142 ["'A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support'" the jury's verdict."'].)

2.     *Substantial evidence supports Perez's conviction of felony child abuse (count 4)*

As discussed, Perez was charged in count 4 with felony child abuse based on the theory he hit Kyis in the groin sometime between September 1 and 8, 2018, inflicting unjustifiable physical pain on Kyis.  Substantial evidence supports the jury's finding that Perez inflicted the groin injury.  Chanish and Perez had custody of Kyis on September 7, when Kyle met them at an exchange location in Los Banos for the custody exchange.  The next day Kyle watched Kyis during Lydia's birthday party, and Kyle did not observe any injuries.  But when Kyle helped Kyis remove his wet clothing for a bath, Kyis complained of pain when

50

Kyle started pulling down Kyis's pants. At that point Kyle noticed the large bruise on Kyis's groin area, and when Kyle asked what had happened, Kyis responded that "'Steve had punched me in the night.'" Kyle asked Lartigue to take a look at Kyis. Lartigue heard Kyis crying and saw a "blue and kind of purple-ish" bruise on Kyis's groin area. Lartigue testified Kyis "was actually kind of scared and nervous" to say what had happened, but Kyis stated consistently that Perez "had went in his room at night and had punched him in his groin." Kyis repeated his statement that "Steve hit me" two days later to Ruezga and Officers Cuevas and Battles during an interview at the Dos Palos police station.

Perez suggests Kyis may have sustained the injury at the party because if Kyis had sustained a groin injury before Kyle picked him up on Friday, Kyis likely would have complained about it. But Kyis was nervous about telling Kyle about his injury, and he only disclosed it after Kyle asked what had happened. Further, there is no evidence Kyis was injured at the party. The jury could have reasonably inferred that Kyis did not disclose the abuse until Kyle saw the injury and asked what had happened because Kyis was scared to reveal it.

Perez also asserts multiple arguments why it was Chanish who caused the injury. He notes the photograph of Kyis's groin injury (exhibit 101) only corroborated that Kyis was injured, not that Perez caused the injury.[24] Further, Kyis made numerous

---

[24] Perez also argues the prosecutor did not present any evidence to establish who took the photograph or when it was taken. However, Lartigue testified Kyle photographed Kyis's groin injury. And Kyle testified that on September 8 he sent Chanish's grandmother a photograph of the groin injury because

51

conflicting statements regarding other injuries he sustained in October, including that two different students threw a toy truck at him and Kyle had hit him after Kyis broke a piece of Kyis's bicycle. And Kyis's unsolicited statement to Ruezga that Perez hit him after Ruezga asked him about school, as well as Kyis's inability to answer follow-up questions from Officer Battles, showed Kyis had been coached. Perez also relies on evidence Chanish became easily frustrated with Kyis, exhibited inappropriate parenting behavior, and lied about how Kyis sustained his other injuries. By contrast, there was no evidence Kyis was afraid of Perez, and Perez was able to comfort Kyis after Officer Cuevas drove Kyis and Chanish home from the unsuccessful October 30 MDIC interview. In addition, Perez argues Kyis had a motive to lie because he wanted to spend more time with Kyle.[25]

Although the jury could have found Perez's contentions persuasive, it did not. As discussed, on appeal we consider whether substantial evidence supports the jury's finding, not whether the circumstances could have supported a contrary finding. (*Westerfield, supra*, 6 Cal.5th at p. 713; *Penunuri, supra*, 5 Cal.5th at p. 142.) Kyis's consistent statements that Perez had

she did not believe him. Officer Cuevas likewise testified Kyle showed the officers a picture of Kyis's groin injury on September 10. In light of this testimony, the jury could reasonably have inferred Kyle took the photograph of Kyis's groin injury on September 8.

[25] Perez ignores testimony from Lartigue that Kyis told her he did not like Perez, Perez yelled at him, and Perez threw hot sauce at him. In addition, as discussed, it is speculative that Kyis would have made up the allegation that Perez hit him in order to spend more time with Kyle.

hit him, first made on the day after Kyle took custody of Kyis from Perez and Chanish, along with the photograph of Kyis's significant groin injury, amply support Perez's conviction of felony child abuse as charged in count 4.

3. *Substantial evidence supports Chanish's convictions of felony child abuse for counts 2 and 3 but not count 4*

The jury was instructed under the third branch of section 273a, subdivision (a), that to find Chanish guilty of felony child abuse, the People had to prove that while having care or custody of Kyis, Chanish willfully caused or permitted Kyis's person or health to be injured under circumstances likely to produce great bodily harm. (*Valdez, supra*, 27 Cal.4th at p. 783; see CALCRIM No. 821, Alternative C.) Count 4 alleged conduct between September 1 and 8, 2018 (the groin injury), count 3 alleged conduct between October 12 and 22, 2018 (the facial injuries), and count 1 alleged conduct on November 6, 2018 (the abdominal injuries that caused Kyis's death). In her closing argument, the prosecutor argued with respect to counts 2 and 3 that Chanish was "charged with felony child abuse under the theory of endangerment for allowing her son to be with this man, who she's been put on notice that has abused him before." As to count 4, the prosecutor similarly argued Chanish permitted Kyis to be placed in a situation in which he suffered great bodily injury inflicted by Perez.

To convict Chanish of felony child abuse, the jury had to find Chanish willfully caused or permitted Kyle's person or health to be injured. (*Valdez, supra*, 27 Cal.4th at p. 787;

53

*People v. Flores, supra*, 2 Cal.App.5th at p. 874.)[26]  The mens rea for "indirect abuse" under section 273a, subdivision (a), is criminal negligence.  (*Valdez*, at pp. 786-787; *Flores*, at p. 874.)  Criminal negligence ""must be aggravated, culpable, gross, or reckless, that is, the conduct of the accused must be such a departure from what would be the conduct of an ordinarily prudent or careful [person] under the same circumstances as to be incompatible with a proper regard for human life . . . or an indifference to consequences."" (*Valdez*, at p. 788; accord, *Stark v. Superior Court* (2011) 52 Cal.4th 368, 399.)  "'Under the criminal negligence standard, knowledge of the risk is determined by an objective test:  "[I]f a reasonable person in defendant's position would have been aware of the risk involved, then defendant is presumed to have had such an awareness."" (*Valdez*, at p. 783; accord, *Williams v. Garcetti* (1993) 5 Cal.4th 561, 574 ["there can be no criminal negligence without actual or constructive knowledge of the risk"]; *People v. Felton* (2004) 122 Cal.App.4th 260, 269.)

Chanish contends the People failed to present evidence she was criminally negligent for permitting Perez to live with Kyis in September 2018, enabling Perez to inflict injury on Kyis.  We agree substantial evidence does not support the jury's finding of criminal negligence on count 4.  The People argue a reasonable

---

[26]     *Valdez* considered the fourth branch of child abuse, in which a defendant willfully permits a child to be placed in a situation where his or her person or health is endangered.  (*Valdez, supra*, 27 Cal.4th at p. 787.)  However, the criminal negligence standard is the same for indirect abuse under either the third branch of child abuse (permitting the child's person or health to be injured) or the fourth branch (permitting the child's person or health to be endangered).  (*Id*. at pp. 789-790.)

person in Chanish's position would have been aware in September of the risk that Perez would inflict injury on Kyis because, as Perez told detectives, he spanked his biological children as a form of discipline. Perez admitted in his testimony that he spanked his son one time during his relationship with Quiroz. However, there is no evidence Chanish was aware that Perez had spanked his son. Further, even if Chanish was aware that Perez had previously spanked his son, absent evidence the discipline was excessive, a reasonable person in Chanish's position would not have suspected that Perez would violently injure Kyis. Nor is there any other evidence Chanish was or should have been aware of Perez's violent nature. The People's argument that Chanish should have known about the abuse because they lived in a two-bedroom apartment with the bedrooms "directly apart from each other" likewise lacks merit because there is no evidence of the size of the apartment, where the abuse took place, or whether Chanish was home when it happened.

The People also rely on Perez's testimony that Chanish would sometimes get frustrated and scream and curse at Kyis and that she hit Kyis one time. But the prosecutor did not argue at trial that Chanish caused Kyis's groin injury. And even if the jury believed Chanish had hit Kyis one time, this does not bear on whether a reasonable person under the same circumstances would have been aware of Perez's likely abuse. We therefore reverse Chanish's conviction on count 4.

Chanish also argues there was not substantial evidence to support her convictions on counts 2 and 3 because there is no evidence anyone told her that Perez had punched Kyis in September, and therefore she would not have been on notice that Perez might injure him again. Substantial evidence supports

55

Chanish's convictions on both counts. On September 8, after Kyle discovered Kyis's groin injury, he called Chanish and asked why Kyis had a bruise on his groin area, refusing to return Kyis to her care. A few days later Ruezga and Officers Cuevas and Battles interviewed Chanish about Kyis's injury. And the police issued a five-day emergency protective order against Chanish and Perez after Kyis disclosed that Perez had hit him. The jury could have reasonably inferred that Ruezga, Officers Cuevas and Battles, or Kyle informed Chanish of Kyis's accusation against Perez during the investigation. A reasonable person in Chanish's position, with knowledge of the accusation against Perez as to the September groin injury, would have been aware Kyis was at risk of being physically injured by Perez if Kyis continued to reside with him.

4. *Substantial evidence supports Perez's conviction of assault on a child causing death (count 1)*

"Assault on a child resulting in death requires a showing that (1) the defendant had care or custody of a child under eight years old, (2) the defendant did an act that by its nature would directly and probably result in the application of force to the child, (3) the defendant did that act willfully, (4) the force used was likely to produce great bodily injury, (5) when the defendant acted, he was aware of facts that would lead a reasonable person to realize that his act by its nature would directly and probably result in great bodily injury to the child, (6) when the defendant acted, he had the present ability to apply force likely to produce great bodily injury to the child, and (7) the defendant's act caused the child's death." (*People v. Sanchez* (2020) 49 Cal.App.5th 961, 978; accord, *People v. Wyatt* (2010) 48 Cal.4th 776, 780.) "Because the defendant 'need not know or be subjectively aware

56

that his act is capable of causing great bodily injury,' the requisite mens rea may be established 'even when the defendant honestly believes his act is not likely to result in such injury.'" (*People v. Wyatt* (2012) 55 Cal.4th 694, 702.)

On appeal, Perez argues only that he is not the one who committed the act that caused Kyis's injuries and death. Substantial evidence supports the jury's finding that Perez caused the fatal injuries. Dr. Super testified that Kyis died from abdominal bleeding caused by one or more punches or kicks likely inflicted within three hours before his death at 1:30 a.m. on November 7, 2018.[27] As Perez concedes on appeal, only Chanish and Perez had the opportunity to injure Kyis on the night of November 6. It is undisputed that Kyle returned Kyis to Perez and Chanish's home on Monday evening, November 5. Kyis went to preschool the next day, and when he returned at noon, Perez and Chanish put a blanket outside for Kyis to play on and left their apartment door open so they could watch him. There is no evidence Kyis suffered an injury that day while in school or while he was playing outside. And given the jury's finding that Perez hit or punched Kyis in the groin area two months earlier, causing a significant injury, the jury could have reasonably concluded it was Perez who again inflicted the injuries on Kyis.

According to Perez, after dinner he went to the master bedroom and watched a basketball game on his cell phone and listened to the game through his headphones from approximately

---

[27] Perez notes Dr. Super acknowledged the injuries could have resulted from a fall from a good height onto something rounded or a significant bicycle accident. But there is no evidence Kyis fell from a tall structure or fell off his bicycle on November 6.

6:30 until almost 10:00 p.m. Perez asserts Chanish could have hit or kicked Kyis in the abdomen while Perez was watching the basketball game or when she went to Kyis's room before going to bed. However, if Chanish injured Kyis prior to 10:00 p.m., it was outside the three-hour window Dr. Super identified as when the injuries likely occurred.

Perez next argues Chanish was still awake when Kyis collapsed, pointing to the November 15 pretext call in which Chanish told Lartigue multiple times that she had been awake and saw Kyis have a seizure and collapse. But in her November 20 police interview Chanish told detectives she was asleep when Kyis collapsed, and she had lied to Lartigue because she did not trust Lartigue and wanted to get her off the phone. Chanish's November 20 statement was consistent with Perez's statement to the detectives that he had to kick the bed to wake up Chanish. It was also consistent with Perez's admission on cross-examination that when he said in the 911 call "get your ass up now," he was directing the comment to Chanish. Further, in his November 20 police interview, Perez admitted Chanish took medication for anxiety and depression, which corroborated Chanish's statement to detectives that she took an anti-depressant medication before going to bed at 9:00 p.m.

Perez also points to evidence of Chanish's inappropriate parenting behavior to suggest Chanish caused Kyis's death. When Chanish attempted to buckle Kyis's seatbelt in Rodriguez's car after leaving the hospital on October 24, Kyis started screaming and crying, and Chanish responded by placing part of her left hand in his mouth. Chanish told Rodriguez "she couldn't believe that it was okay for [Kyis] to bite her or hit her, but it wasn't okay for her to do the same to him." When Kyis broke free and ran out of the car, Chanish started screaming profanities,

58

grabbed him by his shirt collar, and pulled him for a few minutes. Certainly, Rodriguez's testimony shows Chanish reacted inappropriately to Kyis's behavior, and the jury could have found she was the one who punched or kicked Kyis. But it did not. Instead, the jury could have reasonably believed that Chanish took anti-depressant medication and went to bed at 9:00 p.m., then was asleep when Perez abused Kyis, causing Kyis to collapse on the floor. (*Westerfield, supra*, 6 Cal.5th at p. 713; *Penunuri, supra*, 5 Cal.5th at p. 142.)

G.     *Perez Was Not Prejudiced by the Cumulative Effect of the Errors*

Perez contends he suffered cumulative prejudice from multiple errors. "'[A] series of trial errors, though independently harmless, may in some circumstances rise by accretion to the level of reversible and prejudicial error.'" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1009; accord, *In re Reno* (2012) 55 Cal.4th 428, 483 ["In theory, the aggregate prejudice from several different errors occurring at trial could require reversal even if no single error was prejudicial by itself."].) In evaluating cumulative error, we consider whether the cumulative error caused the trial to be fundamentally unfair in violation of the Fourteenth Amendment's due process guarantee. (*People v. Rogers* (2006) 39 Cal.4th 826, 890; *Cunningham*, at p. 1009 [cumulative error did not render trial "fundamentally unfair," observing "[d]efendant was entitled to a fair trial but not a perfect one"]; *People v. Thomas* (2021) 64 Cal.App.5th 924, 971 ["'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial."'"].)

Considered cumulatively, the four errors we found or assumed did not affect the outcome of Perez's trial or render it

fundamentally unfair. As discussed, with respect to the instruction on the lesser offense of attempted assault on a child causing death, the jury was offered the option to convict Perez on the lesser offense but convicted him of the greater offense. As to the delay in instructing the jury on assault with force likely to produce great bodily injury, 11 of the initial jurors found Perez guilty of the greater offense of assault on a child causing death even after being instructed on both the greater and lesser offenses. Although the court erroneously instructed the jury on criminal negligence for the felony child abuse count, in finding Perez guilty of child abuse the jury necessarily found Perez hit Kyis with the intent to inflict the injury. And Perez failed to show it was reasonably likely he would have obtained a more favorable verdict had juror no. 2 not been excused.

H.    *Section 654 Does Not Apply to Chanish's Multiple Child Abuse Convictions*

At the time of Chanish's sentencing, former section 654, subdivision (a), provided, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."[28]

---

[28]    Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441), effective January 1, 2022, amended section 654 "to remove the requirement that a court impose the longest sentence when a defendant is convicted of more than one offense arising from the same conduct." (*People v. Lopez* (2022) 78 Cal.App.5th 459, 468; accord, *People v. Mani* (2022) 74 Cal.App.5th 343, 351.) Current section 654, subdivision (a), provides, "An act or omission

The trial court sentenced Chanish to the middle term of four years on count 2, plus consecutive terms of 16 months each on counts 3 and 4. The court explained, "And I am running them consecutive because these were all separate instances that happened to Kyis. She was aware of them. And I admit she took him to the doctor and appeared to try to be doing what she could, but I don't think she really was doing what she could. . . . Her best [course] or way of action would have been to remove him from that home. And unfortunately, I'm sure she does regret his loss now, and it's going to be hard for her to live with, but it's still—she lost her child because of those acts."

Chanish contends the trial court erred by not staying the sentence under section 654 on count 3 for felony child abuse because her convictions on counts 2 and 3 arose from a single course of conduct with a single intent and objective.[29] (See *People v. Rodriguez* (2009) 47 Cal.4th 501, 507 [section 654 bars separate punishment for multiple offenses arising from the same act or from a series of acts constituting an indivisible course of criminal conduct].) We do not reach whether Chanish's convictions of child abuse arise from an indivisible course of

---

that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision."

[29] Chanish argues the sentences on two of the three counts should have been stayed, but because we reverse Chanish's conviction on count 4, we only address whether the court should have stayed the sentence on count 3.

61

conduct because section 654 does not apply to Chanish's convictions of the same provision of the Penal Code.

Although not cited by Chanish or the People, in *People v. Correa* (2012) 54 Cal.4th 331, 344 (*Correa*) the Supreme Court held that based on the language and purpose of section 654, it only applies to conduct that violates multiple criminal code provisions. The defendant in *Correa* was convicted of seven counts of being in possession of a firearm after he was apprehended from a house with a cache of seven guns. (*Id*. at p. 334.) In holding section 654 did not apply to bar multiple punishment for the convictions, the Supreme Court disapproved dictum in footnote 1 of its earlier decision in *Neal v. State* (1960) 55 Cal.2d 11, 18, which stated, "Although section 654 does not expressly preclude double punishment when an act gives rise to more than one violation of the same Penal Code section or to multiple violations of the criminal provisions of other codes, it is settled that the basic principle it enunciates precludes double punishment in such cases also." (See *Correa*, at p. 337.)

The *Correa* court observed the language of section 654 made clear it only barred punishment for an "'act or omission that is punishable in different ways by *different* provisions of law.'" (*Correa, supra*, 54 Cal.4th at p. 341.) The court held, "[H]aving reconsidered the *Neal* footnote, we conclude that section 654 does not bar multiple punishment for violations of the same provision of law. In doing so we reject dictum, correct a legally unsupported principle, are more consistent with our later jurisprudence, and conform to the plain language of the statute." (*Id*. at p. 344; accord, *People v. Chung* (2015) 237 Cal.App.4th 462, 468 [considering *Correa* but applying section 654 to two counts of transportation of different controlled

substances because the counts were punishable under separate provisions of the Health and Safety Code].)

The Supreme Court in *Correa* cited with approval its earlier decision in *People v. Harrison* (1989) 48 Cal.3d 321, 337, which held section 654 did not apply to bar punishment for three convictions of forcible sexual penetration where the defendant committed the acts in succession. (See *Correa, supra*, 54 Cal.4th at p. 342.) The *Harrison* court explained that "[t]o adopt such an approach [applying section 654] would mean that 'once a [defendant] has committed one particular sexual crime against a victim he may thereafter with impunity repeat his offense,' so long as he does not direct attention to another place on the victim's body, or significantly delay in between each offense." (*Harrison*, at p. 337.)

Here, as in *Correa* and *Harrison*, Chanish was convicted on counts 2 and 3 for violation of the same statute—for felony child abuse. Thus, section 654 does not apply. To hold otherwise would be contrary to the language of section 654, and further, would have allowed Chanish to continue to allow Perez access to Kyis despite repeated abuse by Perez, without additional consequences.

I.    *Senate Bill 567's Amendments to Section 1170, Subdivision (b), Require Resentencing of Perez on Count 4*

At the time of Perez's sentencing, former section 1170, subdivision (b), provided as to offenses for which there are three possible terms, "the choice of the appropriate term shall rest within the sound discretion of the court." On count 4 for child abuse, the court found the aggravating factors outweighed the mitigating factors and imposed the upper term of six years. The court explained, "As to count 4, that's the punch to the groin or

63

the hit to the groin, I am going to find certain factors in aggravation, that crime did involve great body harm or threat of great bodily harm.  And it did display a high degree of cruelty, viciousness and callousness to hit a young boy like that, only five years old, in his groin that left a horrible, horrible bruise.  [¶]  He was only five.  I think he was particularly vulnerable.  I guess you could argue it's a dual use of facts because you had care and custody of child.  Obviously, children are vulnerable, but I think that's such a young age that makes it extra aggravating.  So I'm finding that as an aggravating factor as well.  I would also find under Rule 421(b)(1) that you have engaged in violent conduct that does indicate a serious danger to society.  So I think those are aggravating factors . . . .  [I] find the aggravating factors outweigh the mitigating factors as to count 4 . . . .  So as to count 4 you would receive upper term of six years."

Senate Bill 567 amended section 1170, subdivision (b), effective January 1, 2022, to limit the trial court's sentencing discretion, as follows:  "(1) When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2).  [¶] (2) The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial. . . .  [¶] (3) Notwithstanding paragraphs (1) and (2), the court may consider the defendant's prior convictions in determining

sentencing based on a certified record of conviction without submitting the prior convictions to a jury."

Perez contends, the People concede, and we agree Senate Bill 567's changes to section 1170, subdivision (b), are retroactive under the principles set forth in *In re Estrada* (1965) 63 Cal.2d 740, 742 because they lessen the punishment for the offense by limiting the trial court's discretion to impose the upper term of imprisonment. (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109 ["section 1170's current statutory language applies retroactively in all nonfinal cases"]; *People v. Lopez* (2022) 78 Cal.App.5th 459, 465 ["[t]he People properly concede that Senate Bill No. 567's ameliorative amendments to section 1170, subdivision (b) apply retroactively to all cases not yet final as of January 1, 2022"]; see *People v. Frahs* (2020) 9 Cal.5th 618, 628 ["'*Estrada* stands for the proposition that, "where the amendatory statute mitigates punishment and there is no saving[s] clause, the rule is that the amendment will operate retroactively so that the lighter punishment is imposed."'"]; *People v. Superior Court (Lara)* (2018) 4 Cal.5th 299, 307.)

As the People concede, Perez is entitled to resentencing under the amendments to section 1170, subdivision (b), because in selecting the upper term on count 4, the court relied on circumstances in aggravation that were not stipulated to by Perez or found true by the jury beyond a reasonable doubt. Accordingly, we vacate Perez's sentence and remand for resentencing consistent with section 1170, subdivision (b).

## DISPOSITION

We affirm Perez's convictions.  We reverse Chanish's conviction on count 4 for felony child abuse and affirm her other convictions.  We vacate the sentences for Perez and Chanish and remand with directions for the trial court to resentence them in accordance with the terms of section 1170, subdivision (b)(2), and all other applicable, newly enacted ameliorative legislation.


                                                FEUER, J.

We concur:


        PERLUSS, P. J.


        SEGAL, J.